**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

VICKIE (NICHOLS) FETT,

       Plaintiff,

vs.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

       Defendant.

No. C 14-3034-MWB

**MEMORANDUM OPINION AND**
**ORDER ON THE MERITS**

———————————

**TABLE OF CONTENTS**

I.    **INTRODUCTION**..................................................................... 2
    A.   *Background* ................................................................ 2
    B.   *The ALJ's Findings* ................................................. 3

II.   **LEGAL ANALYSIS** ............................................................ 5
    A.   *Applicable Standards*............................................... 5
        1.   *Disability determinations and the burden of proof*.................. 5
        2.   *The substantial evidence standard of review* .......................... 8
    B.   *Application Of The Standards*.................................... 9
        1.   *Severity of mental impairments*....................................... 10
            a.   *Applicable standards* ............................................ 10
            b.   *Medical evidence* .................................................. 11
            c.   *The ALJ's findings* .............................................. 23
            d.   *Analysis* ............................................................. 24
        2.   *Evaluation of subjective allegations* .................................. 27
            a.   *Applicable Standards* ............................................ 27
            b.   *The ALJ's findings* .............................................. 29
            c.   *Analysis* ............................................................. 32
               i.   *Mental impairments* ..................................... 32
               ii.   *Physical Impairments* ................................... 34
        3.   *Development of the record*........................................... 36
            a.   *Applicable Standards* ............................................ 36

|  |  | b. | Analysis ............................................................... 37 |
|---|---|---|---|
|  | 4. |  | Other source evidence—chiropractor ................................ 40 |
|  |  | a. | Applicable standards .............................................. 40 |
|  |  | b. | The ALJ's Findings ............................................... 42 |
|  |  | c. | Analysis ........................................................... 42 |
| III. | CONCLUSION | | ................................................................. 44 |

This matter is before me pursuant to Vickie Fett's application for Disability Insurance benefits under Title II of the Act, 42 U.S.C. § 401 *et seq*. Fett seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for benefits. Fett argues that the administrative record (AR) does not contain substantial evidence to support the Commissioner's decision that she was not disabled during the relevant period of time.

## I. INTRODUCTION
### A. Background

Fett was 50 years old at the time of the ALJ hearing. She dropped out of high school but received her GED. Fett has had intermittent employment through her life, holding a wide variety of jobs, including as a cashier, laborer, and solderer. At the time of the hearing, Fett was married, with adult children. Fett filed an application for disability insurance benefits based primarily on back problems, neck problems, and anxiety issues.

Fett filed her application for disability on April 13, 2011. Fett was denied initially on June 9, 2011, and on reconsideration on July 29, 2011. She requested an Administrative Law Judge (ALJ) hearing, which was held on January 3, 2013. On January 23, 2013, ALJ John E. Sandbothe entered a decision denying disability benefits. On February 13, 2013, Fett filed a request for review, which the Appeals Council denied on April 8, 2014. Thus, the decision of the ALJ is a final decision of the Commissioner of Social Security. Fett timely filed the present complaint on June 9, 2014. (docket no. 1).

On January 26, 2015, Judge O'Brien held a telephone hearing on Fett's complaint. This case was reassigned to me on August 20, 2015. I have reviewed the record, along with the audio recording of the hearing, and now enter the following.

## B.    The ALJ's Findings

In this case, the ALJ found as follows:

(1)    The claimant last met the insured status requirements of the Social Security Act on March 31, 2008. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of July 15, 2005, through her date last insured of March 31, 2008. (20 C.F.R. § 416.971 *et seq.*).

(2)    The claimant has the following severe impairments: degenerate disc disease status post fusion (20 C.F.R. § 404.1520(c)).

(3)    The claimant's medically determinable mental impairment of depression and anxiety did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and was therefore non-severe.

(4)    The claimant's history of marijuana use and current alcohol use do not cause more than minimal limitations in her ability to perform basic work activity. As such,

3

the claimant's substance abuse is found not material to the determination of disability.

(5) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

(6) Applying "paragraph B," the claimant has no difficulties in the activities of daily living, no difficulties in social functioning, mild difficulties with regard to concentration, persistence or pace; and no episodes of decompensation. Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

(7) Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part § 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). The claimant has the residual functional capacity to perform the following: lift 10 pounds frequently and 20 pounds occasionally and only occasionally climb, balance, stoop, bend, kneel, crouch or crawl. She is limited to simple, routine or repetitive work.

(8) The claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

(9) The opinion of the state agency medical consultant was entitled to substantial weight.

(10) The claimant was capable of performing past relevant work as a solderer (light, unskilled) and as a cashier

4

> (light, unskilled). This work did not require the
> performance of work-related activities precluded by
> the claimant's residual functional capacity.
>
> (11) The claimant was not under a disability, as defined in
> the Social Security Act, from July 15, 2005, through
> the date last insured, March 31, 2008 (20 C.F.R.
> § 404.1520(f)).

AR 16-20.

## II. LEGAL ANALYSIS

### A. Applicable Standards

#### 1. Disability determinations and the burden of proof

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity (RFC) to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); see 20 C.F.R. § 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id*. If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. Id. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must show not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the

national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### 2. *The substantial evidence standard of review*

Turning the standard for judicial review, the Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); see 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit Court of Appeals explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support

is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

### B.    *Application Of The Standards*

Fett contends the ALJ's decision is flawed for a number of reasons:

1.    The ALJ erred in failing to find additional severe impairments of anxiety and depression.

2.    The ALJ erred in finding that Fett's subjective allegations were not fully credible regarding both her mental and physical impairments.

3. The ALJ erred by not inquiring into and fully and fairly developing the record regarding Fett's condition prior to her date last insured.

4. The ALJ erred in failing to consider the opinion of Fett's chiropractor.

(docket no. 7). I will consider these challenges in turn.

## 1. *Severity of mental impairments*

### a. *Applicable standards*

At Step Two, the ALJ must consider whether a medically determinable impairment is "severe." 20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment is one which "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; capacities for seeing, hearing and speaking; understanding, carrying out and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). If the impairment would have no more than a minimal effect on the claimant's ability to work, it is not severe. *Page*, 484 F.3d at 1043.

It is the claimant's burden to establish that his or her impairment or combination of impairments is severe. *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ." *Kirby*, 500 F.3d at 708 (internal citation omitted). When a claimant has multiple impairments, "the Social Security Act requires the Commissioner to consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling." *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000).

"Some of the factors an ALJ may consider when determining a claimant's mental impairments are (1) the claimant's failure to allege mental impairments in his complaint, (2) failure to seek mental treatment, (3) the claimant's own statements, and (4) lack of medical evidence indicating mental impairment." *Partee v. Astrue*, 638 F.3d 860, 864 (8th Cir. 2011). The mere presence of a mental disorder does not automatically indicate a severe disability. *Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990). When considering a claimant's own complaints, the ALJ is required to explicitly discredit a claimant and provide reasons. *See Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) ("[A]n ALJ who rejects such [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints.").

In determining whether a claimant's mental impairments are "severe," the regulations require the ALJ to consider "four broad functional areas in which [the ALJ] will rate the degree of [the claimant's] functional limitations: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). If the degree of limitation in the first three functional areas is "none" or "mild" and there are no episodes of decompensation, then the ALJ should conclude that it is a non-severe impairment unless the evidence indicates otherwise. *Id*. §§ 404.1520a(d)(1), 416.920a(d)(1).

### b.    *Medical evidence*[1]

The medical record in this case starts in 2004. On August 18, 2004, Fett appeared at the Mercy Family Clinic in Clear Lake (her regular health service provider),

---

[1] Fett suffers from both mental and physical limitations. Her arguments regarding mental and physical impairments are separate. However, the medical records, especially from the applicable time period, are often mixed. That is to say, Fett would attend a doctor's appointment ostensibly about her back pain, and then talk about her anxiety (or

complaining of back pain and leg numbness. AR 268. Dr. Mark Dankle noted that Fett had a history of glaucoma, migraines, anxiety disorder, and degenerative disc disease. AR 268. After X-raying Fett, Dr. Dankle diagnosed Fett with, "[a]cute low back pain that appears to be disc syndrome. Evidence of arteriosclerotic change in her abdominal aorta. . . ." AR 267. Dr. Dankle also noted a number of cardiovascular risks. *Id*. He prescribed Fett pain medication and muscle relaxants. Id. Dr. Dankle also made a number of suggestions regarding Fett's cardiovascular risks (quit smoking, lose weight, etc.), but Fett stated that, because she did not have insurance, she had a hard time following up with medical care. AR 267.

On August 27, 2004, Fett followed up regarding her back pain at the Mercy Family Clinic. AR 266. She saw Dr. Donald Berge and complained that even with over the counter medication, her back continued to ache. *Id*. Fett stated that she had problems walking more than short distances. Dr. Berge recommended that she try some back exercises. *Id*. Fett returned to Dr. Berge on September 17, 2004, with a sprained ankle, but continued to complain about her back pain. AR 264.[2] On November 23, 2004, Fett saw Dr. Berge for issues related to chronic bronchitis. AR 262. Dr. Berge prescribed Fett both a cough medication and an anti-inflammatory medication. *Id*. Fett returned to Dr. Berge on March 1, 2015, complaining of acute knee pain. AR 260. Dr. Berge prescribed Fett a compressive knee sleeve. AR 259. A few days later, Fett returned to

---

vice versa.). Accordingly, the following is a review of all of Fett's medical records, which will be referred to both in this section and in subsequent sections. Additionally, the medical records contained in the administrative record are not presented in any sort of rational order. Thus, the page number progression does not reflect a linear progression through time.

[2] Throughout this period, Fett was also treated for her cholesterol. *See* AR 258, 260, and 261.

Dr. Berge with sinus symptoms. AR 257. Dr. Berge prescribed various medications to treat sinusitis. *Id.*

On June 8, 2005, Fett presented to Dr. Berge with acute anxiety. AR 256. Fett conveyed to Dr. Berge various situational stressors, principally related to her romantic relationship. *Id.* Dr. Berge gave Fett a work release and prescribed her short term anxiety medication. *Id.*

Fett presented to Dr. Berge on August 3, 2005, with back pain. AR 255. Fett stated that she had injured her back approximately a month previously at work and had been treating with a chiropractor and the occupational health service. *Id.* Dr. Berge ordered x-rays, which revealed no bony abnormality, no degenerative lipping, well maintained disc spaces, and no vertebral body abnormalities. *Id.* Dr. Berge diagnosed Fett with a back spasm and prescribed a pain medication (along with a pain medication she had been prescribed by another provider.) AR 255. Dr. Berge did note that a month was an unusually long time for back pain to persist. *Id.* Fett also complained that her job was not accommodating the work restrictions that the occupational health services had assigned her. On August 30, 2005, Fett had an annual gynecological exam, which was unremarkable, except that Fett noted she had quit her job. AR 254.

On December 6, 2005, Fett called Dr. Berge's office complaining about acute emotional distress. AR 252. Dr. Berge was not available and the clinic directed Fett to an emergency services provider. *Id.* Accordingly, Fett saw Dr. Jeffrey Jackson at the Mercy Medical Center. AR 299. Dr. Jackson diagnosed Fett with panic disorder and started her on an anxiety medication. *Id.* Fett called Dr. Berge a few days later, asking if Dr. Berge could refill the medication she received on December 6, 2005. AR 251. Dr. Berge told Fett she needed to contact the prescribing doctor. *Id.* Fett finally saw Dr. Berge on December 23, 2005. AR 247. Fett stated that she was suffering from severe depression. *Id.* She also was having neck pain. Dr. Berge noted Fett's history

of anxiety disorder and intermittent explosive disorder, along with secondary degenerative disc disease. Fett stated that she stopped taking the medication prescribed by the emergency room doctor because it was causing side effects. *Id.* Dr. Berge diagnosed Fett with depression, anxiety, and probable degenerative disc disease. AR 247. He prescribed Fett a depression medication, directed her to take over the counter pain medication, and assigned her various neck exercises. *Id.*

On January 30, 2006, Fett called Dr. Berge saying that her depression was worse. AR 246. Dr. Berge increased her depression medication and directed her to come in for a follow up appointment. Id. Fett called a few days later saying her symptoms were worse. AR 245. Dr. Berge added another anxiety medication. *Id.* Fett appeared as directed on February 7, 2006, stating that her depression had not improved. AR 244. She stated that she could not stop crying. *Id.* Dr. Berge noted Fett's long history of emotional trauma, including a violent rape at the age of 18. *Id.* Dr. Berge diagnosed anxiety and depression and prescribed Fett another depression medication.[3] *Id.* He directed Fett to follow up in a few weeks. *Id.* Fett called the next day to inform Dr. Berge she was discontinuing one of the medications because it was making her ill. AR 243. At her follow up appointment on March 17, 2006, Fett stated she was still experiencing anxiety, especially in dealing with her husband. AR 242. Dr. Berge continued Fett on her medications and encouraged her to try some type of therapy. *Id.*

At her annual exam on May 1, 2006, Fett broke down crying because her husband wanted her to discontinue her depression medication because of the expense. AR 241. Dr. Berge listened, but noted there was not much he could do. *Id.* He continued Fett on the previously prescribed medications, but noted that one, Zoloft, would soon become

---

[3] Dr. Berge also asked Fett about counseling as a possible treatment choice. Fett stated she had tried counseling in the past, but it made her symptoms worse.

generic and would be cheaper to buy. *Id*. Fett returned to Dr. Berge a few weeks later with back pain, but noted she had stopped taking her other medications. AR 240. Dr. Berge noted that back pain had been a recurrent problem for Fett since a work place injury in 1995. *Id*. Dr. Berge diagnosed sciatica and prescribed a number of pain medications. AR 239. On May 31, 2006, Fett still had back pain, but had discontinued some of the medications because they made her feel "weird." AR 238. Dr. Berge ordered some other tests (pending financial assistance for Fett) and re-prescribed a steroid and pain medication. AR 238. He affirmed his prior diagnosis of L5 sciatica. *Id*. Fett called a few days later stating she had an upset stomach from the medication. AR 237. Dr. Berge directed Fett to take over the counter remedies for her stomach ailments and told her she could discontinue the pain medication if she wanted to. *Id*.

At a follow up exam on July 25, 2006, Fett noted that she had discontinued her depression medication for financial reasons. AR 235. She stated that her mental status had improved somewhat, but it was situationally affected. *Id*. She also stated that her back continued to bother her. *Id*. She was treating with a chiropractor, but only got relief by being sedentary. *Id*. Dr. Berge diagnosed her with chronic anxiety with panic episodes and degenerative disc disease of both the cervical and lumbar spine. AR 234. Dr. Berge directed her to continue treatment with her chiropractor and noted that even routine care, such as a mammogram, was contingent on Fett getting financial assistance. *Id*. Fett returned a few weeks later, again complaining of back pain. AR 233. She saw Dr. Brent Brunsting. *Id*. He ordered x-rays, which revealed mild degenerative change in the lumbar spine. He diagnosed sciatica and prescribed steroids and pain medication. *Id*. Fett followed up with Dr. Brunsting two weeks later, and stated that the medication had not helped. AR 232. She told Dr. Brunsting that she only got relief from resting. He offered further testing and neurosurgical consult, but Fett stated that she could not afford those things. AR 232. However, Fett returned a week later, and Dr. Brunsting

ordered an MRI. AR 231. Following the MRI, Dr. Brunsting found, "broad-based disc at L5-S1 without any encroachment on the spine or evidence of nerve root involvement." AR 229. He diagnosed sciatic features and recommended that Fett begin physical therapy and continue on pain medications.[4]  *Id.*, AR 296.

On September 21, 2006, Fett saw Dr. Berge for cold-like symptoms. AR 228. Fett told Dr. Berge that she was in counseling, but the counseling was very stressful. *Id.* She also stated that her back continued to bother her. *Id.*[5]  On January 8, 2007, Fett presented to Dr. Berge with acute neck pain, which began after she lifted a baby. AR 226. Dr. Berge ordered x-rays, which showed some narrowing between discs. *Id.* Dr. Berge again diagnosed degenerative disc disease and prescribed pain medication and neck stretches. *Id.* Dr. Berge also noted that Fett continuously used over-the-counter pain medication to deal with back/neck pain. *Id.* Fett had a similar appointment with Dr. Berge on March 8, 2007, regarding continued back/neck pain. AR 225. Fett asked about getting disability and Dr. Berge observed that, "[Fett] does have limitation of motion but her endurance is very poor. She finds she cannot sit at a computer very long

---

[4] In Fett's brief, there is a discussion of the medication Fett was taking at that time. To quote the brief, "[p]rior to her date last insured, the claimant was taking Tramadol (a narcotic-like pain reliever used to treat moderate to severe pain), Hydrocodone (a semi-synthetic opioid derived from codeine), and Sulindac (a non-steroidal anti-inflammatory drug). (TR 229). These medications are consistent with **fatty's** disability claim." (docket no. 7, p. 15) (emphasis added). No doubt the pejorative description used to refer to Fett was a scrivener's error from an early draft of the brief. (Or, less likely, some type of autocorrect error gone horribly awry.) Even so, I hope I do not need to point out to plaintiff's attorney, Thomas Krause, how totally inappropriate such an error is. It is beneath both the dignity of this Court and counsel's firm. Counsel is directed to apologize profusely to his client for the oversight and for the insult.

[5] Fett had another chronic bronchitis flare up in December of 2006. AR 227. Dr. Berge noted that Fett needed to quit smoking. *Id.* At later dates, the chronic bronchitis became associated with a diagnosis of COPD. AR 246.

because her neck hurts. She cannot ride very long driving because her neck hurts, but it is not radiating out in the arm like it was before. It is mainly from the back of the neck and a little bit in to the shoulder and up into the back of the head." AR 225. Dr. Berge encouraged Fett to take her prescribed pain medication. *Id*. He also enrolled her in physical therapy. The records indicate that Fett attended physical therapy twice, on March 12, 2007, and April 4, 2007. AR 300-301. On June 25, 2007, Fett had an annual exam. Dr. Berge noted that Fett suffered from chronic anxiety and depression, which appeared to be controlled by medication. AR 223. Dr. Berge also noted that Fett suffered from degenerative cervical spine disease and right sternoclavicular joint. *Id*. Dr. Berge recommended that Fett continue in physical therapy to treat her neck and back issues. *Id*. However, Fett complained that even with physical therapy, her back issues were still quite painful. AR 225.

On November 14, 2007, Fett saw Dr. Berge regarding her chronic bronchitis type issues. AR 355. Dr. Berge prescribed an antibiotic, but Fett noted that she could only go on medication if her husband agreed to pay for it. *Id*. A week later, Fett was still treating for her bronchitis, but was also suffering from chest pain. AR 354. Dr. Berge prescribed a pain medication. *Id*. On Valentine's Day, 2008, Fett again returned to Dr. Berge with chronic bronchitis-type symptoms. AR 253. Dr. Berge diagnosed an upper respiratory infection and prescribed a variety of medications. *Id*. Fett called Dr. Berge a few days later wondering if her glaucoma eye drops were interfering with her other medications. AR 252.

At Fett's annual exam in May of 2008, Dr. Berge noted Fett's continued problems with anxiety, depression, back/neck pain. AR 349-350. Fett also complained of hip pain and again noted that further testing, including a routine mammogram, was contingent on her finding a funding source. *Id*. On September 10, 2008, Fett saw Dr. Tracy Mixdorf at the Mercy Family Clinic. AR 248. Fett complained of feeling shaky and not "feeling

right." *Id*. Dr. Mixdorf did not have a clear diagnosis, thinking Fett mighbt be suffering anxiety or a viral illness. *Id*. Fett did not want to do further testing because of cost issues. *Id*. Fett saw Dr. Connie Arispe on December 11, 2008, for chronic bronchitis/COPD issues. AR 345-346. Dr. Arispe again recommended that Fett quit smoking and recommended further testing, which Fett declined because of cost concerns. *Id*. Dr. Arispe prescribed Fett a variety of medications to clear up her cough. *Id*. Fett had a comprehensive exam with Dr. Berge on February 9, 2009. AR 242-244. For the most part, Dr. Berge reviewed Fett's lingering issues, including glaucoma, COPD, anxiety, etc. Dr. Berge noted that Fett's back was so stiff she could barely get out of her chair and, because of her nervous issues, she was in tears through the appointment. AR 343. Fett also complained about leghip pain and her ongoing funding issues. AR 242-244. Dr. Berge urged Fett to resume her treatment for glaucoma and pursue various low-income medical assistance programs. *Id*.

Fett saw Dr. Brunsting for chest and arm pain on May 6, 2009. AR 340-341. Dr. Brunsting noted that Fett seemed depressed and prescribed her pain medication. *Id*. Fett had a follow up appointment with Dr. Berge later in May of 2009 for gynecological issues. AR 337. On June 23, 2009, Fett saw Dr. Arispe for a refill of her anxiety medication. AR 336. Fett stated that she normally took the medication at night and sometimes during the day if needed. *Id*. She also stated that she had joined a support group, which helped her condition. *Id*. Fett saw Dr. Berge a few months later to again discuss her anxiety. AR 334. Fett cried throughout the appointment, while discussing her relationship and her children (who also were experiencing mental health issues). *Id*. Dr. Berge refilled her anxiety medication. *Id*.

Fett saw Dr. Mixdorf on December 2, 2009, regarding bronchitis issues. AR 233. Dr. Mixdorf prescribed a variety of medications to get Fett's cough under control. *Id*. Fett saw Dr. Berge for the same issue a few weeks later. AR 232. Dr. Berge started

Fett on a new type of inhaler.  *Id*.  Two weeks later, Fett presented to Dr. Berge still coughing with chest pain.  AR 231.  Dr. Berge prescribed Fett a pain medication and continued the medications prescribed by Dr. Mixdorf.  *Id*.

On March 26, 2010, Fett saw Dr. Berge because she was feeling increased back pain.  AR 330.  Dr. Berge took x-rays, which revealed no significant changes.  *Id*.  Dr. Berge prescribed Fett a muscle relaxant along with various back exercises.  *Id*.  On April 5, 2010, Fett saw Dr. Berge for her annual exam.  AR 329.  No new issues were discussed, although Dr. Berge noted Fett's ongoing issues with depression, anxiety, and chronic back/neck pain.  AR 227-229.  On May 18, 2010, Fett presented to Dr. Berge and wanted to talk about her chronic bronchitis/COPD.  AR 326.  Dr. Berge prescribed a new medication and also talked with Fett about a plan to cease smoking.  *Id*.  Fett stated that, for the first time in many years, she had health insurance.  *Id*.  On June 15, 2010, Fett saw Dr. Berge and complained about a number of issues.  AR 324.  After an examination, it was determined that Fett was suffering from gallstones.  AR 322-323.  Notably, Fett was tearful and appeared upset during her appointment.  AR 324.  Fett treated for gallstones for several weeks and her gallbladder was removed on July 2, 2010.  AR 319-322, 409-410.  In the fall of 2010, Fett treated several times with Dr. Berge for issues related to sinusitis and her chronic cough.  AR 316-317.

On April 19, 2011, Fett saw Dr. Dankle regarding back/neck pain.  AR 315.  Fett reported that she had taken a fall, which aggravated her back.  *Id*.  Dr. Dankle noted Fett's history of neck pain and cervical disc disease.  *Id*.  Dr. Dankle prescribed a muscle relaxant and directed Fett to follow up if the pain did not subside.  AR 314.  Fett had her annual exam with Dr. Berge a week later.  AR 311-313.  Dr. Berge did not find any significant changes in Fett's health and listed her ongoing issues as abnormal cholesterol, chronic anxiety disorder, and COPD.  AR 311.  Dr. Berge also noted the ongoing back/neck pain.  AR 312.  Dr. Berge started Fett on a new cholesterol medication, but

Fett had a bad reaction and the new medication was discontinued within days. AR 310. A few weeks later, Fett saw Dr. Brunsting for bronchitis/cough issues. AR 308. Dr. Brunsting prescribed Fett a number of medications to get the cough under control. AR 307. Fett saw Dr. Dankle soon after, stating that her cough had not resolved. AR 373. Dr. Dankle placed Fett on a more aggressive regime of antibiotics. Id. On June 1, 2011, Fett informed Dr. Dankle that she had not improved, but Dr. Dankle instructed Fett to continue on the prescribed medications. AR 372. Dr. Dankle also noted that Fett's treatment for COPD was ongoing. Id. On June 14, 2011, Fett saw Dr. Dankle for a follow up regarding her cough. AR 370-371. Fett said that her cough had improved. AR 371. Dr. Dankle noted that Fett was trying to quit smoking and refilled her anxiety medication. AR 370-371.

On May 20, 2011, Douglas Sande, a chiropractor, wrote a letter to the Commissioner. AR 359. Dr. Sande stated that he had treated Fett 14 times for chronic low back pain at the L5 disc on the right. Id. He stated that MRI scans revealed mild broad based posterior disc protrusion at L5-SI with mild central canal narrowing. Id. He stated that Fett could not lift more than 25-30 pounds, four to five times per day. Id. He also stated she could only stand, walk, or sit for more than a half an hour at a time. AR 359. Dr. Sande limited Fett to 15 minute intervals when climbing, stooping, kneeling, and crawling. Id. Dr. Sande also provided three pages of treatment notes. AR 361-363. The text of the individual notes is difficult to read, but it is clear that the notes show Dr. Sande treated Fett numerous times between 2005 and 2008. AR 361-363.

On June 29, 2011, Fett saw Dr. Erin Peterson at the Mercy Medical Center regarding her back/neck pain. AR 381. Fett reviewed the history of her pain, stating that her back issues began at work in 1995, and her neck pain began after a car accident in 1998. Id. Dr. Peterson recorded Fett's medical history as having COPD, anxiety, glaucoma, and chronic back/neck pain. AR 382. Dr. Peterson also reviewed past

radiological results and found that Fett had degenerative disc changes in C5-6 and a mild broad based disc bulge at L5-S1. AR 383. Dr. Peterson diagnosed Fett with chronic neck pain, predominately myofascial in the cervical spondylosis, chronic low back pain in the setting of degenerative arthritis of the lumbar spine, bilateral trochanteric bursitis, and anxiety. AR 383.

Around the same time, Dr. Rene Staudacher performed the initial disability determination for the Commissioner on June 9, 2011. AR 45-53. Dr. Staudacher found that Fett's back/neck pain were her only impairments and they were not disabling before the date last insured. AR 53. On July 28, 2011, Dr. Matthew Byrnes performed a record review for the Commissioner. AR 388. Dr. Byrnes determined that Fett's subjective allegations were not credible and affirmed Dr. Staudacher's finding that Fett was not disabled. *Id*.

In the summer of 2011, Fett began to treat more intensely for her back/neck pain. Dr. Peterson referred Fett for an MRI. On July 21, 2011, Dr. Timothy Lucas performed the MRI and noted Fett had disc extrusion at L5-S1 and degenerative disc disease at T11-12 and L5-S1. AR 391. He also suspected bilateral L4-5 facet arthropathy. *Id*. Dr. Peterson referred Fett for an epidural steroid injection, which was performed on August 9, 2011, by Dr. Gary Swenson. AR 411. Dr. Peterson referred Fett to Dr. David Beck. AR 395-396. Dr. Beck referred Fett to Accelerated Rehabilitation Centers, where she saw physical therapist Alison Fuhrman. AR 458-459, 463. The rehabilitation goal was to increase Fett's range of motion and increase her day to day functioning. AR 459. Fett regularly followed up with physical therapy over the next several weeks, even though she complained therapy often made her symptoms worse. AR 460-463. When physical therapy failed to treat Fett's problems, Dr. Beck recommended surgery. AR 395-396

After Dr. Beck recommended surgery, Fett had a pre-operative consultation with Dr. Dankle. AR 451. Dr. Dankle noted Fett's history of COPD, anxiety, and

depression, although he said all three were controlled with medication. AR 451. On November 29, 2011, Dr. Beck performed a fusion at L5-S1 to treat her severe disc degeneration and herniated intervertebral disc at that level. AR 450. Dr. Beck encountered no complications in the procedure and considered it a success. AR 454-455. Post-surgery follow ups showed further degenerative changes in Fett's spine, minor degenerative spondylosis anterior superior L3 and L2 endplates, and arthritic changes in her hips. AR 423-424. However, there were no interval changes noted in the discs, and the surgical implants appeared to be in place. AR 424-426.

Fett returned to Accelerated Rehabilitation Centers after her surgery. AR 440. She began treatment February 20, 2012. *Id*. By March 5, 2012, the physical therapist noted that Fett had made good progress, was putting forth maximum effort, and had a decrease in her subjective complaints of pain. AR 442-443, 444.[6] PT Fuhrman discharged Fett from physical therapy on April 19, 2012, stating that Fett had met all post-surgery treatment goals. AR 403-404.

Fett had an appointment with Dr. Peterson on December 3, 2012. AR 448-449. Dr. Peterson indicated that the appointment was to document issues for the purposes of Fett's disability case. AR 448. However, Fett also complained of worsening pain in her neck. *Id*. On the topic of limitations, Dr. Peterson stated, "there is nothing specific I can identify to restrict her in today. . . ." AR 448-449. Dr. Peterson went on to say that it was unclear whether Fett's neck pain was acute or chronic. AR 449. Regarding Fett's neck pain, Dr. Peterson recommended further testing. AR 449. Dr. Peterson performed an MRI which revealed further degenerative changes to Fett's spine. AR 406-407.

---

[6] Through this period of time, Fett also suffered from some gynecological and gastrointestinal issues. See AR 412-422, 427-429.

### c.    The ALJ's findings

Regarding Fett's mental limitations, the ALJ found:

> The claimant's medically determinable mental impairment of depression and anxiety did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and was therefore nonsevere.  In making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 C.F.R., Part 404, Subpart P, Appendix 1).  These four broad functional areas are known as the "paragraph B" criteria.  The first functional area is activities of daily living.  In this area, the claimant had no limitation.  She reported an ability to prepare meals, do household chores and care for her personal needs with limitations due only to physical complaints.  The next functional area is social functioning.  In this area, the claimant had no limitation. The claimant reported spending time with others, going out to eat and to the park.  She reported that she did not need anyone to accompany her on these outings.  The third functional area is concentration, persistence or pace.  In this area, the claimant had mild limitation.  Treatment records revealed that her concentration was fair.  The claimant reported an ability to handle money and to use a checkbook. She testified that she watched television and read books.  The fourth functional area is episodes of decompensation.  In this area, the claimant had experienced no episodes of decompensation which have been of extended duration. Because the claimant's medically determinable mental impairment caused no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, it was nonsevere (20 C.F.R. § 404.1520a(d)(l)).

AR 16-17.

### d.  *Analysis*

Fett's first argument it that the ALJ erred by failing to find that Fett had a severe mental impairment at step two of the sequential evaluation. The Commissioner makes two arguments in response. First, the Commissioner argues that, essentially, the severe impairment finding is irrelevant because the ALJ found one severe impairment and was then required to consider both severe and non-severe impairments at the subsequent steps of analysis. Second, the Commissioner argues that Fett's mental impairments were not severe.

The Commissioner's first argument is too circular to be given any credit. It is true that, once an ALJ finds a claimant has at least one severe impairment, the ALJ must consider all limitations when crafting an RFC. However, that does not mean the finding of additional severe impairments is irrelevant. Obviously, if the ALJ failed to properly consider the evidence in a way that caused that ALJ to overlook a severe impairment, the ALJ is also going to overlook relevant evidence when crafting an RFC. As was stated above, 'severity' is not an onerous requirement for the claimant to meet. In most borderline disability cases, the ALJ will find that an impairment is 'severe' but then find that even with 'severe' restrictions, the claimant has the RFC to resume working. The reverse situation, were the ALJ finds no severe impairment but then adds limitations based on the non-severe impairment to the RFC, is not a common occurrence. Thus, the Commissioner's real argument is that the ALJ's non-severe finding is supported by substantial evidence.

The ALJ accurately stated the regulations regarding mental impairments. When the evidence establishes that a claimant has a medically determinable mental impairment, the ALJ must rate the claimant's functional limitations in four areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. 20 C.F.R. § 404.1520a(b)-(c). The Commissioner refers to these four

areas as the "B" criteria. If the evidence shows that the claimant has no more than mild limitations in each of the first three criteria and no episodes in the fourth criteria, then the claimant's mental impairments qualify as non-severe. 20 C.F.R. § 404.1520a(d)(1). In this case, the ALJ primarily relied upon Fett's statements to conclude that her only limitation was a mild limitation in concentration, persistence, or pace.

In her brief, Fett points out eight portions of her testimony from the ALJ hearing that she believes show that her mental impairments should be considered severe. (docket no. 7, p. 9-10). Some of those statements, and the way they are presented in Fett's brief, are questionable. For example, Fett cites the fact that she dropped out of high school. However, there is nothing in the hearing testimony that indicates why she dropped out of high school. So, obviously, I cannot consider the fact she dropped out of high school as evidence that her mental impairments are severe. Additionally, in her brief, Fett states she left a job due to mental problems, citing page 30 of the administrative record. However, that page of the transcript actually says Fett left a job because she, "had problems with my daughters, mental problems with my daughters and I had to quit so they wouldn't fire me." AR 30. A fair reading of that statement leads me to believe that Fett left her job to care for her daughters, who, elsewhere in the record, are described as severely affected by mental health issues. Even into adulthood, at least one of Fett's daughters has lived with and been cared for by Fett. At any rate, those statements are merely evidence that could be used to determine that Fett's impairments were severe. My job is not to determine if Fett's impairments could be severe, my job is to determine if the ALJ's decision that Fett's impairments were not severe is supported by substantial evidence.

In looking at whether the ALJ's determination is supported by substantial evidence, the first factor I will consider is whether Fett had any episodes of decompensation. As was set out above, the ALJ said that Fett had no episodes of

decompensation.[7]   The ALJ did not cite to any evidence or otherwise elaborate on that conclusion.   However, the record has several instances that seem to be episodes of decompensation.   For example, on June 8, 2005, a few weeks before the alleged onset date, Fett presented to Dr. Berge with acute anxiety.   AR 256.   Fett conveyed to Dr. Berge various situational stressors.   *Id*.   Dr. Berge gave Fett a work release and prescribed her short term anxiety medication.   Id.   An anxiety attack so severe that it required Fett to miss work and take new medication is an episode of decompensation.   Then, after the alleged onset date, on December 6, 2005, Fett called Dr. Berge's office complaining about acute emotional distress.   AR 252.   Dr. Berge was not available and the clinic directed Fett to an emergency services provider.   *Id*.   Accordingly, Fett saw Dr. Jeffrey Jackson at the Mercy Medical Center.   AR 299.   Dr. Jackson diagnosed Fett with panic disorder and started her on an anxiety medication.   *Id*.   Then, as was set out more fully above, Fett spent the next month repeatedly seeing medical providers for acute emotional distress and a variety of treatment options were pursued.   There is no doubt that, at least initially, this was an episode of decompensation.   There are several other

---

[7] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.   Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).   Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode."   20 C.F.R. § Pt. 404, Subpt. P, App. 1.

instances in the medical record where Fett appeared at the doctor's office crying and suffering from severe emotional distress. AR 241, 334.

Clearly, there is evidence in the record that Fett had episodes of decompensation. The ALJ did not explain why he did not consider those episodes, nor did he ever question Fett about episodes of decompensation. Thus, the ALJ's paragraph "B" analysis was flawed.[8] As will be discussed more below, the ALJ failed to credit, or discredit, Fett's subjective allegations regarding her mental impairments. In short, Fett stated that she had (possibly) disabling anxiety issues, but the ALJ failed to evaluate the credibility of those statements. Based on those two issues, I must find that the ALJ's determination that Fett had no severe mental impairments is not supported by substantial evidence.

### 2. *Evaluation of subjective allegations*

#### a. *Applicable Standards*

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). Accordingly, the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole. *Id*.

To determine a claimant's credibility, the ALJ must consider:

    (1)      the claimant's daily activities;

    (2)      the duration, intensity, and frequency of pain;

    (3)      the precipitating and aggravating factors;

    (4)      the dosage, effectiveness, and side effects of medication; and

---

[8] It is unclear, based on the record, whether Fett had repeated episodes of decompensation for extended periods of time.

       (5)     any functional restrictions.

*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). "'Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility.'" *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001)). However, the Eighth Circuit Court of Appeals has repeatedly stated that "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." *Hogg v. Shalala*, 45 F.3d 276, 278-79 (8th Cir. 1995) (citing *Harris v. Sec'y of Dep't of Health and Human Servs.*, 959 F.2d 723, 726 (8th Cir. 1992)). A claimant need not prove she is bedridden or completely helpless to be found disabled. *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005). Yet, the Eighth Circuit Court of Appeals has also held that "cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain." *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009).

      With respect to determining whether activities of daily living are inconsistent with subjective complaints of disability, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others over a period of time and the frequency, appropriateness, and independence of the activities." *Wagner v. Astrue*, 499 F.3d 842, 852 (8th Cir. 2007) (citing *Leckenby v. Astrue*, 487 F.3d 626, 634 (8th Cir. 2007)). "Other relevant factors include the claimant's relevant work history, and the absence of objective medical evidence to support the complaints." *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (quoting *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). An ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence, *Halverson v. Astrue*, 600 F.3d 922, 931-32 (8th Cir. 2010), but such evidence is one factor that the ALJ may consider. *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008). The ALJ need

not explicitly discuss each factor as long as the ALJ acknowledges and considers the factors before discounting the claimant's subjective complaints. *Goff*, 421 F.3d at 791. "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

When an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the court should normally defer to the ALJ's credibility determination. *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003). It is not my role to re-weigh the evidence. *See* 42 U.S.C. § 405(g); *see also Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) ("[I]f, after reviewing the record, [the Court] find[s] that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings, [the Court] must affirm the decision of the Commissioner.") (citations and quotations omitted). However, in reviewing the ALJ's credibility determination, I must consider the evidence that both supports and detracts from the ALJ's decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012) (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). It is not appropriate to reverse the ALJ's decision simply because some evidence would support a different conclusion. *Perks*, 687 F.3d at 1091. An ALJ is not required to discuss every piece of evidence that was submitted, and an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998). I must defer to the ALJ's determination regarding the credibility of testimony as long as it is supported by good reasons and substantial evidence. *Id*. (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)).

### b.    The ALJ's findings

At her hearing before the ALJ, Fett testified she suffers from near daily anxiety attacks along with depression. AR 36. She testified that, when she has an attack, she

breaks down crying.  *Id*.  She also testified about having flashbacks to a violent rape she suffered when she was in her teens.  AR 38-39.  Finally, she testified that she has a hard time being around people.  AR 41.  Regarding her physical limitations, Fett testified she could lift 10 pounds, and could only walk or sit for a few minutes at a time without experiencing pain.  AR 39-40.  She testified that she did not believe there were any jobs she could perform because of her back/neck pain.  *Id*.

The ALJ found:

> The undersigned has reviewed the claimant's prior work history during the past 15 years.  Such review has revealed that the claimant has had either no earnings or nominal earnings in all the years relevant to this decision.  In fact, an award of Supplemental Security Benefits alone at the full benefit rate would result in more annual income than she had in earned FICA income in most of her working years (Exhibit 5D).  That could be a substantial inducement to allege disabling symptoms.  After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

AR 19.  The ALJ articulated specific concerns regarding the credibility of Fett's statements about her physical limitations:

> The evidence establishes that the claimant has a history of low back pain.  Treatment notes in August 2004 substantiate treatment for low back pain although x-rays at the time showed no significant bony abnormalities.  The claimant was continued on Ibuprofen 800 mg.  The claimant was seen on August 3, 2005, with complaints of low back pain subsequent to lifting a moneybag at work in July 2005.  It was noted that she seemed to move without complaints when getting dressed

but had a lot of complaints during the evaluation. Twisting of the torso did not seem to aggravate her pain. Further, an exam on July 25, 2005, noted good motion in her low back although she complained of pain as she abducted. The claimant was able to flex to within four inches of the floor. X-rays in August 2006 were also negative. And an MRI of the lumbar spine performed the following month was remarkable only for mild broad based posterior disc protrusion at L5-S1 with mild central canal narrowing. There was no encroachment on the spine or evidence of nerve root involvement. An exam on September 14, 2006, was positive for low back pain with sciatic features. And while it is beyond the claimant's date last insured for disability benefits, x-rays on March 26, 2010, revealed minimal lumbosacral junction degenerative disc changes, strong suspicion of both cholelithiasis and bilateral nephrolithiasis and mild atherosclerotic calcification (Ex. 1F/54, 52, 49 and 45, 12, 7). With regard to her neck pain, multiple treatment notes have established that the claimant has full range of motion of her cervical spine (Ex. 1F/ 25 and 33). An x-ray of her cervical spine on January 8, 2007 showed degenerative disc changes with degenerative spurring at CS-6. There was encroachment of the intervertebral foramen on the left side. On March 8, 2007, the claimant indicated that she might apply for social security disability. However, her primary care physician, Donald Berge, M.D., told her that he did not find abnormality on physical exam or loss function. Treatment notes in June 2007, revealed that the claimant was involved in physical therapy for her neck and right shoulder pain. It is noted that she has received only conservative treatment for her complaints of pain to include some narcotic pain medications such as Hydrocodone (Ex. 1F/51 and 2-3). In reviewing the claimant's credibility, it is noted that during office visits, the claimant reported lifting a grandchild who weighed 20 pounds for over two days in December 2005 (Ex. 1F/25). And in January 2007, she complained of neck pain

after babysitting a grandson weighing 30 pounds (Ex. 1F/4). However, yet she testified to an ability to carry only 5 pounds of laundry for about 10 feet and that she had pain when carrying a gallon of milk. Yet, in her Function Report, she revealed an ability to play Frisbee and kickball for 15 minutes. However, she testified to an ability to walk for only two blocks due to her pain. The claimant further testified to an ability to drive for 45 minutes to an hour. She later testified to an ability to sit for only 15 to 20 minutes. The claimant's inconsistent statements detract from her credibility. The claimant reported an ability to perform household chores and personal care with limitations caused by pain. She reported an ability to grocery shop for over an hour although she needed her husband's assistance to carry the items (Ex. 7E/6). It is noted that no physician of record has placed significant restrictions on her ability to engage in daily activities.

AR 18-19. The ALJ did not discuss Fett's subject complaints regarding her mental impairments.

### c.     *Analysis*

#### i.     *Mental impairments*

Fett argues that the ALJ erred by failing to credit, or even consider, her subjective allegations regarding her anxiety and depression. The Commissioner does not dispute the fact that the ALJ's decision fails to articulate any rationale for discrediting Fett's subjective allegation of disabling mental impairments. However, the Commissioner argues that the ALJ's inclusion of boiler plate language that he considered all of Fett's testimony under the *Polaski* standard is sufficient.

It is true the Eighth Circuit Court of Appeals has stated, "The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official

duties," *United States v. Ahrens*, 530 F.2d 781, 785–86 (8th Cir.1976), and that the Eighth Circuit Court of Appeals has extended that rule to social security disability cases. *Wilburn v. Astrue*, 626 F.3d 999, 1004 (8th Cir. 2010). However, the Eighth Circuit Court of Appeals has also stated, "[A] remand is appropriate where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit this Court to conclude that substantial evidence supports the Commission's decision." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822 (8th Cir. 2008).

After considering the medical record in this case, there is no reasonable dispute that Fett has a history of treating for anxiety and depression. Fett's anxiety is mentioned or discussed at nearly every medical appointment she had prior to having back surgery. Additionally, her traumatic history, which includes a violent rape, is a recurrent topic of conversation. Other recurrent topics are the fact that Fett's mother was schizophrenic and that her daughters have severe mental health issues. For most of the relevant time period, Fett took mood stabilizing drugs. During the brief period Fett stopped taking anxiety medication, she appeared at her doctor's office crying because her husband would not pay for her to keep getting the medicine. The record also has instances where Fett's treating provider encouraged her to seek more in-depth mental health help, such as therapy, but Fett stated that she could not afford it. AR 242. Based on the medical record in this case, I am convinced the ALJ erred by not at least discussing Fett's subjective allegations regarding her mental impairments. Fett presented substantial medical evidence that she has suffered from anxiety and depression for years. Her subjective complaints may well be consistent with that medical history.

The Eighth Circuit has stated that, "[an] ALJ's failure to adequately explain his factual findings is 'not a sufficient reason for setting aside an administrative finding' where the record supports the overall determination." *Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999). However, a decade's worth of medical records in this case support

the fact that Fett suffers from anxiety and depression. There are no medical opinions in the record contradicting Fett's claim, and the ALJ chose not to order a consultative examination. Thus, this is the exact type of case contemplated in the Scott decision cited above, where the Eighth Circuit Court of Appeals held remand was appropriate when the ALJ failed to articulate his factual finding and the factual finding was not clearly supported by the record. *Scott*, 529 F.3d at 823. By failing to articulate why he discounted Fett's subjective complaints regarding her mental impairments, the ALJ has rendered it impossible for me to rule that his finding is supported by substantial evidence. Accordingly, a remand is appropriate on this issue.

## ii.    *Physical Impairments*

Fett also argues that the ALJ erred by discounting her subjective complaints of disabling back limitations. On this issue, the ALJ's decision is on much firmer ground as he gave detailed reasons for discounting Fett's subjective complaints and limitations.

First, the ALJ discussed the medical record in this case. The ALJ (correctly) pointed out that, between the alleged onset date and the date last insured, Fett's neck and back issues were in their early stages. As stated by the ALJ, an x-ray in August of 2004 showed no significant bony abnormalities. X-rays in 2006 were also negative, and an MRI of the lumbar spine performed the following month was remarkable only for mild broad based posterior disc protrusion at L5-S1 with mild central canal narrowing. There was no encroachment on the spine or evidence of nerve root involvement. After Fett's date last insured, x-rays on March 26, 2010, revealed minimal lumbosacral junction degenerative disc changes, strong suspicion of both cholelithiasis and bilateral nephrolithiasis and mild atherosclerotic calcification. In short, the ALJ determined that, although Fett routinely treated for back/neck pain in the applicable time period, the medical record only supports a finding that Fett had early stage back/neck conditions that gradually got worse. Regarding Fett's actual medical treatment, the ALJ found it

significant that Fett's doctors mainly prescribed conservative treatment, such as over-the-counter medications with occasional prescription medication for acute pain. As is well settled in this Circuit, conservative treatment such as over-the-counter medication and limited use of prescription medication can be inconsistent with a claimant's allegations of disabling pain. *Moore v. Astrue*, 572 F.3d 520, 524–25 (8th Cir. 2009).

Second, the ALJ noted inconsistencies in the record regarding Fett's limitations. For example, although Fett treated for acute back/neck symptoms during the applicable time period, she also had numerous exams where she reported improved pain and a full range of motion.[9] The ALJ also discussed Fett's various activities that are reported in the record, such as lifting a grandchild who weighed 20 pounds for two days in December 2005, and then lifting the same (but heavier) grandchild in 2007. The ALJ contrasted those statements with her testimony that she could only carry 5 pounds of laundry for about 10 feet and that she had pain when carrying a gallon of milk. The ALJ also noted that, in her function report, Fett said she could play Frisbee and kickball for 15 minutes, but then testified she could only walk two blocks. Fett also said she could drive for an hour, but then stated that she could only sit for 20 minutes. "[A]cts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010) (citing *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009)). The ALJ properly cited several inconsistencies in the record that he relied upon in discounting some of Fett's complaints.

The ALJ also discussed Fett's activities of daily living. The Eighth Circuit Court of Appeals has stated that the claimant's ability to perform basic life functions can be a

---

[9] There is no doubt other records reveal significant limitations during the applicable time period. For example, on July 25, 2006, Dr. Berge stated that Fett should stay sedentary to avoid pain. AR 235. However, my job is not to reweigh the evidence, but rather determine if the record evidence supports the ALJ's conclusion.

factor considered by the ALJ in determining if the claimant's allegations are credible. *See Baker v. Barnhart*, 457 F.3d 882, 893 (8th Cir. 2006) (the Eighth Circuit Court of Appeals considered the fact that the claimant was capable of full self-care, drove a car every day, shopped, and ran a number of errands as one factor in determining if claimant's allegations were credible). However, a "limited ability to complete light housework and short errands does not mean [a claimant] has 'the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" *Tilley v. Astrue*, 580 F.3d 675, 682 (8th Cir. 2009) (citing *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) (*en banc*), *abrogated on other grounds by Forney v. Apfel*, 524 U.S. 266, 267 (1996)). In this case, the ALJ properly considered, and cited, Fett's ability to perform basic life tasks as one factor in determining if her allegations were credible. The record has numerous references to the fact that, during the applicable time period, Fett drove, took care of herself, and even took care of her ailing parents, her daughters with mental health issues, and her grandchild. Those activities are clearly inconsistent with Fett's statements about her completely restrictive back/neck limitations. Accordingly, the ALJ's *Polaski* finding regarding Fett's physical limitations is supported by substantial evidence.

### 3. *Development of the record*

#### a. *Applicable Standards*

In determining the severe impairments and crafting an RFC, the ALJ has a duty to develop the record fully and fairly, independent of the claimant's burden to press her case. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). A social security hearing is a non-adversarial proceeding, and the ALJ must develop the record so that "deserving claimants who apply for benefits receive justice." *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994). "[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for

the ALJ's decision." *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994). An ALJ "is not obliged 'to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability.'" *Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003) (quoting *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996)). "[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." *Haley v. Massanari*, 258 F.3d 742, 750 (8th Cir. 2001). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

### b. Analysis

Fett argues that the ALJ erred by failing to develop the record. Specifically, Fett argues that the ALJ erred by not asking more date specific questions during the hearing, and the ALJ erred by failing to order a consultative examination. Neither argument has merit.

At the ALJ hearing, Fett was represented by attorney David Eastman. The ALJ started the hearing by giving Eastman the opportunity to question his client. Eastman asked numerous questions about Fett's back/neck issues and Fett set out her physical limitations as was discussed above. Fett argues that the ALJ erred by failing to ask her specific questions about her limitations as they were between the alleged onset date and the date last insured. The ALJ hearing was in 2013 and the applicable time period was between 2005 and 2008. Fett argues, or at least implies, that at the ALJ hearing, she was discussing her then current limitations, which were more severe than they were during the applicable time period. Fett believes that, because the ALJ was tasked with determining her limitations as they were between 2005 and 2008, and Fett was talking about her 2013 limitations during the hearing, there was confusion. Fett implies that the confusion over the dates contributed to the ALJ's determination that her allegations were

not credible.  As stated in Fett's brief, "[t]he . . . faulty credibility analysis regarding Fett's physical limitations was a consequence of a failure to communicate. . .  Had the ALJ asked Fett to describe her limitations due to her physical and mental impairments prior to her date last insured, he would have been better able to determine whether Fett credibly reported her limitations due to her impairments before her date last insured." (docket no. 7, p. 17, ).

There is no doubt that there was some confusion about the time period during the hearing.  Fett had undergone a hysterectomy shortly before the hearing and her attorney repeatedly reminded her that she needed to discuss the time period prior to that surgery. AR 32.  But, even with Eastman telling Fett to talk about the period before the hysterectomy, there is no indication that Eastman specifically told Fett to discuss the time period between 2005 and 2008.  Thus, the record would be clearer had the ALJ stepped in and directed Fett to discuss her limitations as they were prior to her date last insured. However, reversal is not appropriate simply because something could have been done differently, or additional information might exist.  In fact, a reviewing court almost always spots some minor inconsistency or flaw in the record that, in a perfect world, would be corrected.  However, the question I must consider is whether the record was so underdeveloped that the proceedings prejudiced Fett.

Based on my review, the ALJ's failure to ask date specific questions did not prejudice Fett.  I base my conclusion on three main reasons.  First, this is not a case with a limited medical record.  There are approximately a hundred pages of medical notes discussing Fett's condition during the applicable time period.  Accordingly, the ALJ had adequate documentation from which he could get information about Fett's condition

between 2005 and 2008.[10]  Second, it is not clear from the transcript that the confusion Fett worries about actually occurred.  For instance, some of the conversation at the hearing clearly discussed the earlier time period, such as Fett's statement that her former boss at Casey's would help Fett lift heavy items before she gave up working.  AR 29. Thus, although Fett clearly believes she was talking about the wrong time period, the record evidence that I am tasked with reviewing does not make that so clear.  Third, Fett was represented by counsel at the hearing and her attorney was given broad leeway to ask questions and develop the record as he found appropriate.  Although the ALJ has a duty to develop the record, the ALJ does not have a specific duty to correct counsel's poorly worded questions.  As was discussed in the previous section, there was substantial evidence in the record upon which the ALJ could evaluate Fett's subjective back complaints.  Accordingly, the ALJ did not err by failing to ask date specific questions.

Next, Fett devotes a paragraph of her brief to an argument that the ALJ should have ordered a consultative examination regarding Fett's alleged PTSD.  It is true that an ALJ has an obligation to develop the record, even where the claimant is represented by counsel.  Additionally, the ALJ's duty to develop the record may include an obligation to order a consultative examination.  *See Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000), where the Eighth Circuit Court of Appeals found that the, "ALJ should have sought such an opinion from Nevland's treating physicians or, in the alternative, ordered consultative examinations. . . ."  However, in the extensive review of Fett's medical records set out above, there is virtually no mention of PTSD.  Even though Fett

---

[10] The ALJ's failure to consider the opinion evidence of Fett's chiropractor regarding Fett's physical limitations is a separate issue, which will be discussed in the next section.

mentioned PTSD in the course of discussing her anxiety during the ALJ hearing, there is no indication she was prejudiced by the ALJ's failure to develop the record regarding PTSD as a separate limitation.[11]  Accordingly, the ALJ was under no obligation to develop the record on this issue or order a consultative examination for PTSD.

### 4.    Other source evidence—chiropractor

### a.    Applicable standards

The ALJ must consider medical evidence of record, including treatment notes from "other sources."  See SSR 06-03p.  The Eighth Circuit Court of Appeals has given explicit instruction regarding the weight given to other sources:

> On August 9, 2006, the SSA issued Social Security Ruling (SSR) 06-03p, 71 Fed. Reg. 45,593 (Aug. 9, 2006).  The ruling clarified how it considers opinions from sources who are not what the agency terms "acceptable medical sources."  Social Security separates information sources into two main groups: acceptable medical sources and other sources.  It then divides other sources into two groups:  medical sources and non-medical sources.  20 C.F.R. §§ 404.1502, 416.902 (2007).  Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists.  20 C.F.R. §§ 404.1513(a), 416.913(a) (2007).  According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others: (1) Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment, id., (2) only acceptable medical sources can provide medical opinions, 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007), and (3) only acceptable medical sources can be considered treating sources, 20

---

[11] As was discussed in previous sections, there are several issues with the ALJ's findings regarding Fett's anxiety and depression.  Fett's reference to PTSD symptoms seems to largely overlap with her anxiety related symptoms.

C.F.R. §§ 404.1527(d) and 416.927(d) (2007). Other sources: Medical sources include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. Non-medical sources include school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007). "Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-03p. "Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."

*Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007). The *Sloan* Court went on to say, "In general, according to the ruling, the factors for considering opinion evidence include: [h]ow long the source has known and how frequently the source has seen the individual; [h]ow consistent the opinion is with other evidence; [t]he degree to which the source presents relevant evidence to support an opinion; [h]ow well the source explains the opinion; [w]hether the source has a specialty or area of expertise related to the individual's impairment(s); and [a]ny other factors that tend to support or refute the opinion." *Sloan*, 499 F.3d at 889. "Although a chiropractor is not an acceptable medical source for determining disability, *see* 20 C.F.R. §§ 404.1513(a), 416.913(a), evidence from chiropractors may be used to show 'the severity of [claimant's] impairment(s) and how it affects [claimant's] ability to work,' *see* §§ 404.1513(d), 416.913(d)." *McDade v. Astrue*, 720 F.3d 994, 999 (8th Cir. 2013). However:

[a]lthough the ALJ did not discuss these reports, "an ALJ's failure to cite specific evidence does not indicate that it was

41

not considered." *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000).

*England v. Astrue*, 490 F.3d 1017, 1022 (8th Cir. 2007)

### b.   *The ALJ's Findings*

The ALJ's discussion of medical opinion evidence was brief:

> As for the opinion evidence, on June 9, 2011, a state agency medical consultant reviewed the claimant's file and opined that she was capable of performing a wide range of light work activity (Ex. 2A). The undersigned finds her assessment to be consistent with the evidence as a whole including the claimant's activities noted on her Function Report. It is given substantial weight.

AR 19.

### c.   *Analysis*

Fett argues the ALJ erred by failing to consider the report from her chiropractor, Dr. Sande. The Commissioner admits that the ALJ did not discuss Dr. Sande's report, stating, "The ALJ could have improved his decision by including a discussion of Dr. Sande's opinion," but argues that "the lack of such a discussion does not warrant reversal or remand in this case." (docket no. 11, p. 21). The Commissioner again urges me to rely on boiler plate language to find that the ALJ considered all the opinions in the record.

This issue is clear cut. Although the medical record in this case is long, there are only two examples of medical providers giving opinion evidence for the purpose of this disability determination. In his ruling, the ALJ discussed one of those opinions; the opinion provided by the agency medical consultant. The ALJ omitted any discussion of the other opinion evidence, provided by Fett's chiropractor, Dr. Sande.

On May 20, 2011, Dr. Sande opined that:

> [Fett] should not carry or lift over 25-30 pounds 4-5 times per day. She can stand, walk, or sit no more than ½ hour before

42

> changing activity. She should limit stooping, climbing,
> kneeling, and crawling to no more than 15 minutes before
> doing a different activity.

AR 359. As was discussed above, even though a chiropractor is not an acceptable medical source, Dr. Sande is an 'other source' whose opinion may provide special insight into the condition of the claimant. In this case, Dr. Sande is a provider who routinely saw Fett. More importantly, Dr. Sande is one of only a few providers who treated Fett's back/neck condition during the applicable time period. Fett's primary care physician, Dr. Berge, noted in his records that Fett was treating with Dr. Sande for her back. The record contains (hard to decipher) notes from Dr. Sande confirming he treated Fett numerous times. Accordingly, it seems that Dr. Sande was in a strong position to opine about Fett's condition between 2005 and 2008. The ALJ should have at least considered what weight to assign Dr. Sande's opinion.

Magistrate Judge Scoles of this Court recently considered a very similar case and stated:

> [The claimant, Lee,] argues that the ALJ failed to consider
> the opinions of Dr. Paul D. Eberline, D.C., Lee's
> chiropractor. The record contains 41 treatment notes from Dr.
> Eberline for Lee, dated June 2008 to May 2009. . . Lee
> concludes that "[b]ecause the ALJ completely disregarded Dr.
> Eberline's records, a remand is required." . . . The ALJ's
> decision lacks any discussion of Dr. Eberline's opinions.
> Having considered Dr. Eberline's long treatment history with
> Lee, and Dr. Eberline's opinions regarding Lee's difficulty
> with sitting, breathing, and pain, the Court finds that Dr.
> Eberline's opinions are probative in determining whether Lee
> is disabled, and should have been considered by the ALJ.
> Accordingly, the Court finds that the ALJ's failure to address
> or consider Dr. Eberline's opinions requires remand. See 20
> C.F.R. § 404.1527(d) (an ALJ is required to evaluate every
> medical opinion he or she receives from a claimant); see also

> Sloan, 499 F.3d at 888 (information from "other sources" may be based on special knowledge of the individual and may provide insight into the severity of an individual's impairments and how it affects the individual's ability to function). Therefore, on remand, the ALJ must fully and fairly develop the record with regard to the opinions of Dr. Eberline. Furthermore, in considering Dr. Eberline's opinions, the ALJ shall provide clear reasons for accepting or rejecting Dr. Eberline's opinions.

*Lee v. Astrue*, No. C10-0069, 2011 WL 167252, at *8-9 (N.D. Iowa 2011).

The exact same situation is present in this case. The record demonstrates that Dr. Sande treated Fett numerous times. The physical limitations mentioned by Dr. Sande were certainly relevant to Fett's RFC. But, the ALJ completely failed to mention, reference, or evaluate Dr. Sande's opinion. Accordingly, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ must consider the opinion of Dr. Sande under the 'other source' standard, and, if Dr. Sande's opinion is entitled to weight, the ALJ must consider the opinion when crafting Fett's RFC.


### III. CONCLUSION

After a thorough review of the entire record and in accordance with the standard of review I must follow, I conclude that the ALJ's decision is not supported by substantial evidence. Specifically, the ALJ failed to properly consider whether Fett has severe mental impairments, failed to properly consider Fett's subjective allegations regarding her mental impairments, and failed to consider the opinion of Dr. Sande, Fett's chiropractor. Accordingly, the decision of the ALJ is reversed and remanded for further

consideration as set out above.  Judgment shall be entered in favor of Fett and against the Commissioner.

**IT IS SO ORDERED.**

**DATED** this 15th day of October, 2015.

_Mark W. Bennett_
_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA